AMY M. KARLIN (Bar No. 150016)
Interim Federal Public Defender
JILL GINSTLING  (Bar No. 217911)
(E-Mail: Jill_Ginstling@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone:  (213) 894-4298
Facsimile:  (213) 894-0081

Attorneys for Defendant
OSCAR MARAVILLA CAMACHO, JR.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| UNITED STATES OF AMERICA, | Case No. CR 18-121-SJO |
|---|---|
| Plaintiff, | |
| v. | **OSCAR CAMACHO, JR.'S POSITION RE: SENTENCING; EXHIBITS** |
| OSCAR MARAVILLA CAMACHO, JR, | |
| Defendant. | |

Defendant Oscar Camacho, Jr., through his attorney of record, Deputy Federal Public Defender Jill Ginstling, hereby files his position regarding sentencing.

Respectfully submitted,

AMY M. KARLIN
Interim Federal Public Defender

DATED:  February 10, 2020        By  */s/ Jill Ginstling*

JILL GINSTLING
Deputy Federal Public Defender

## I. INTRODUCTION

Oscar Camacho, Jr. stands before this Court for sentencing following his guilty plea to one count of possession of cocaine with intent to distribute, and one count of conspiracy to dispose of firearms to a prohibited person.  In the two years that have elapsed since he committed these offenses, Mr. Camacho has transformed himself into a loving and responsible father who is committed to rehabilitation, in all of its forms. He has stopped drinking and doing drugs; he has received job training and multiple certifications, including for an organization dedicated to combatting human trafficking; and he has spent his time working and providing for his family.  Six months before he was remanded, at the age of 35, he became a father for the first time.  His devotion to his daughter, and his critical role in her life and her care, are evident to all who know him – as is his sincere remorse for his offense conduct.  The PSR has determined that Mr. Camacho's offense level under the advisory guidelines is 27, and his criminal history is category 2, resulting in an advisory guideline range of 78-87 months. Through this position paper, the defense respectfully requests that the Court impose the mandatory minimum sentence of 60 months.  Such a sentence is sufficient, but not necessary, to impose a severe punishment for the crimes committed by the person who Mr. Camacho used to be, while recognizing the progress he has made and the person who he has become.

## II. OBJECTIONS/FACTUAL CLARIFICATIONS TO THE PSR
### Paragraph 20

This paragraph alleges that Mr. Camacho did not comply with the conditions of his pretrial release because he was remanded on November 4, 2019 after his Pretrial Services Officer received a tamper notice of his electronic monitoring equipment.  This is incorrect.  Defense counsel has spoken with U.S. Pretrial Services Officer Anthony

Granados (of the Northern District of California), who supervised Mr. Camacho.[1]  PSA Officer Granados confirmed that there was no tamper notice on Mr. Camacho's location monitor, and he does not know why the PSR says otherwise.  Officer Granados further confirmed that Mr. Camacho was in compliance with the conditions of his pretrial release throughout his two years on supervision.  And when the Court remanded Mr. Camacho following his change of plea on November 4, 2019, the Court stated that the remand was based on the nature of the charges; there was no mention of an issue with Mr. Camacho's ankle monitor or any other noncompliance.

**Personal and Family Data**

This section of the does not mention that Mr. Camacho and his girlfriend, Monica Ceja, are the parents of an eight-month-old daughter named Grezia Camacho. The defense asks that a revised PSR be prepared with this information included, to ensure that the BOP will allow Mr. Camacho's daughter to visit him in custody.

## III.  APPROPRIATE SENTENCE

In determining the appropriate sentence for Mr. Camacho, the Court must consider all of the statutory sentencing factors set forth at 18 U.S.C. § 3553, including, among other factors, the nature and circumstances of the offense; the history and characteristics of the offender; the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence; the need to provide the defendant with needed education, vocational training, medical care or other correctional treatment; the applicable sentencing range under the advisory

---

[1] Mr. Camacho was arrested and charged in the Northern District of California, where he lives, before he was charged in this district.  It was the Pretrial Services office in the Northern District that put the location monitor on him and was responsible for monitoring Mr. Camacho's location, as well as performing the other aspects of day-to-day pretrial supervision.

sentencing guidelines; and the need to avoid unwarranted sentencing disparities.  18 U.S.C. § 3553(a); *United States v. Booker*, 543 U.S. 220 (2005).  The district court may not employ a presumption that the advisory guideline range is the reasonable or appropriate sentence.  *United States v. Gall*, 522 U.S. 38, 49-50 (2007); *see also United States v. Rita*, 551 U.S. 338, 351 (2007), and "extraordinary circumstances are not needed to justify a sentence outside the guidelines range."  *United States v. Ruff*, 535 F.3d 999, 1002 (9th Cir. 2008).  Instead, the guidelines are but one of many factors for the Court to consider when imposing sentence.  The overall task for the Court is to impose a reasonable sentence, based on the individual defendant and the facts and circumstances of the particular case at hand, that is "sufficient, but not greater than necessary" to achieve the statutory purposes of sentencing.  18 U.S.C. § 3553(a).  This statutory language reflects one of the most long-established maxims of criminology, the "principle of parsimony."  That principle provides that punishment should never exceed the minimum necessary to effectuate the purposes of punishment, and it emphasizes the importance of two fundamental elements of just sentencing:  reasoned judgment and individualized tailoring.  Those elements, and the principle of parsimony, support a sentence of 60 months.

### A.    History and Characteristics of the Defendant

Mr. Camacho is the oldest of three children born to Oscar Morales Camacho and Esther Maravilla Flores.  PSR ¶ 60.  His parents were Mexican immigrants who worked in the fields when Mr. Camacho was a child.  *Id.*  They also sold fruit and clothing at flea markets.  They worked hard enough that they were ultimately able to buy a home for their family, and start some businesses of their own – first a bakery, then a restaurant.  Mr. Camacho has worked with his parents to help support his family since he was a small child, even before he was old enough to go to school.  *Id.* at ¶ 62.  He worked in the field with his mother, then at the bakery at Albertson's, and later in the

4

family's bakery and restaurant. *Id*. at ¶ 65. He also worked at a steakhouse, working his way up to line cook. *Id*. at ¶ 80.

Mr. Camacho's family has always been close, and his parents were strict yet supportive. He did well in school and played sports, in addition to working. *Id*. at ¶ 63. He graduated high school in 2001, and not long after he began buying pork products in Los Angeles for resale in Salinas. *Id*. at ¶¶ 75, 65. He started his own business, which he ran from 2003-2007. *Id*. at p 79. At that time, his father sold the bakery and restaurant so the family could start a food processing business of their own. *Id*. at ¶ 65. A few years after that, Mr. Camacho's mother started a trucking business. *Id*.

From his childhood through early adulthood, Mr. Camacho was a productive member of his hard-working family. As he explains, "I grew up with loving parents who gave me every opportunity to succeed, they allowed me to help them run our family business which I helped to manage for over 20 years." Exh. A (Letter of Oscar Camacho, Jr.). But "somewhere I long the way I do not know why my life took a wrong turn." *Id*. When he was 23 years old, he started using cocaine, and within a few years he became addicted. PSR ¶ 72. He began selling drugs to support his habit, and in 2011 he was went to jail for selling drugs – his only prior conviction. PSR ¶ 53.

That same year, due to the downturn in the economy, Mr. Camacho's parents lost their home. They purchased a fixer upper that they were able to renovate in exchange for rent, and when Mr. Camacho was released from custody in 2012, he helped with that work. In 2013, he commuted between Salinas and southern California, where he worked as a dispatcher for his uncle's trucking company. PSR ¶ 78. In 2014, when his parents were able to buy their current home, he went to work for both of his parents' businesses. A few years later, he met his fiancée, Monica Ceja, and they began dating. But she noticed that he began drinking and partying more, and his behavior changed. *See* Exh. B (letter of Monica Ceja). The drinking led to a relapse of Mr. Camacho's cocaine addiction, and a return to selling drugs to support his addiction, as well as the very expensive guns that he purchased in this case. By the time of his arrest for this

offense, Mr. Camacho was using cocaine virtually every day.  PSR ¶ 72.  As he explains, "I was obsessed with both.  If I wasn't thinking [about] and consuming drugs, I was trying to buy another gun that would allow me a moment of joy."  Exh. A.

His lifestyle and terrible choices came crashing down on him when he was arrested in December 2017, after the agents who were searching for the guns he'd purchased discovered drugs in his home as well.  Since that time, Mr. Camacho has done everything possible to turn his life around and be the responsible member of society who his parents raised him to be.  He moved in with his girlfriend and went to a job training program (the Center for Employment Training), where he studied truck operation, maintenance, computer skills, job preparedness, and customer service skills.  PSR ¶ 76; *see also* Exhibit I (certificates and transcript). He impressed his teachers with his work ethic, attitude, and skill – so much so that a teacher who normally declines to write letters for students who have been convicted of crimes chose to write one for Mr. Camacho, as he has "no doubt that Oscar will make a good employee for someone if given the chance….in Oscar's case I hope there is a possibility of a second chance. *See* Exh. J (Letter of Tom Gentle); *see also* Exh. K (Letter of Laura Mireles).  Mr. Camacho then obtained his Class A driver's license so that he could one day work as a short-haul truck driver.  PSR ¶ 76.  He also received a certification from Truckers Against Trafficking, an organization dedicated to training transportation professionals to assist law enforcement in the recognition and reporting of human trafficking.  *See* Exh. I; *see also* https://truckersagainsttrafficking.org/what-we-do.  Although Mr. Camacho previously had worked at both of his parents' companies, after his arrest he was unable to work with his father, due to bond conditions prohibiting them from having contact. *Id*. at ¶ 79.  So he returned to work at his mother's company, with

reduced income.[2]  *Id.*  Most importantly, he stopped using drugs and alcohol, and he regularly attended drug counseling and testing, as confirmed by Pretrial Services.  As Ms. Ceja observed, "He would go to school, work, and the gym and at home during dinner he would always talk about how he wants to work and maybe in the future still open a restaurant and obtain a chef certificate."  *Id.*

His upward trajectory continued when his daughter Grezia was born in May 2019.  According to Ms. Ceja, "from the moment we found out I was pregnant Oscar who was already doing so well since his release became so much of a better person."  Exh. B.  He is an extremely devoted father who was not only providing for his daughter financially but was also her care provider while Ms. Ceja, a teacher for special needs children, was at work.  Ms. Ceja's brother observed that "the love he had for [Grezia] was obvious in the way this towering man would hold her, and baby talk to her.  He would look at her and his eyes would light up with joy, but they'd also tear up with regret knowing that he would have to leave her."  Exh. D (Letter of Jesus Rigoberto Ceja); *see also* Exh. C (photos).  His niece agrees:  "I know he has matured since he had his daughter, and I truly believe that he will focus on her and himself in order to better their life together.  She is his everything and she means the world to him, which tells me that he will better his life in order to be there for his daughter and those important milestones that are coming up."  Exh. E (Letter of Cristina Cazares).  Simply put, "from the time his offense occurred to now he is a completely different person….A lot has changed in his life.  He no longer drinks or uses any type of controlled substances.  He has a daughter who he has been a great father to since the moment he knew she was on the way."  Exh. B.

---

[2] After he was remanded at the time of his plea, Mr. Camacho has continued to work, serving as an orderly at MDC, where he has received positive work evaluations.  *See* Exh. H.

The Supreme Court has "made clear that post-sentencing or post-offense rehabilitation – particularly in light of its tendency to reveal a defendant's likelihood of criminal conduct – [is] a critical factor to consider in the imposition of sentence." *United States v. Trujillo*, 713 F.3d 1003, 1010 (9th Cir. 2013) (citing *Gall*, 552 U.S. at 59 and *Pepper v. United States*, 131 S.Ct. at 1242-43). For all of these reasons, Mr. Camacho's history and characteristics, particularly his post-offense rehabilitation over the nearly two years that he spent on pretrial release, weigh in favor of a sentence of 60 months. Such a sentence will be sufficient to impose a severe penalty for this offense, while recognizing the progress Mr. Camacho his made, and allowing him to fulfill his most important goal: "I want my daughter to be proud of me and know me not as the father who went to prison, but as her father who changed who he was for her." Exh. A.

## B.   Nature and Circumstances of the Offense and Need to Reflect the Seriousness of the Offense

The defense recognizes that this offense is serious, and that Mr. Camacho must serve several years in prison for his conduct. When compared to the typical drug and gun offenses, however, there are mitigating factors that support a sentence of five years. The drug offense flowed directly from Mr. Camacho's drug addiction, and unlike the majority of federal drug crimes, it did not involve a quantity of drugs that would trigger a 10-year mandatory minimum sentence. As for the gun offense, there are several factors that distinguish it from the typical offense involving firearms. Mr. Camacho is not a gang member or someone with a connection to a criminal organization. He did not possess the guns in furtherance of his drug crime (and he has no history of using guns to commit crimes); nor did he possess the guns for a nefarious purpose. Instead, the evidence at trial established that the guns Mr. Camacho purchased from his co-defendant were collectors' items – highly stylized, customized guns that fetched a high value because of their rarity. As Mr. Camacho explains, he wanted these guns because "some of them were almost 100 years old or were only produced in very limited

quantities, or had unique engravings and finishes to them." Exh. A.  His statements at the time of the offense corroborate this, as he posted a photo of one of the guns to Instagram with the caption, "A golden horse for the collection.  Thanks to my friend @the38superman."  *See* Exh. D to Dkt. 310, Reporter's Transcript at 130:3-6.  The firearms were found unloaded in Mr. Camacho's home, stored in their boxes.  According to the discovery, when the agents were unable to find some of the firearms that they knew that Mr. Camacho had purchased from Mr. Fernandez, Mr. Camacho assisted them by telling them to look in the garage attic – a place that they had not known to search until he told them.  When they did search the attic, they found the remaining guns unloaded, in their boxes, as they testified at trial.  Under these circumstances, a sentence of longer than 60 months is not necessary to reflect the nature and circumstances of the offense.

### C.   Just Punishment, Deterrence, and Public Protection

A sentence of longer than 60 months is not necessary to provide just punishment for this offense, or to deter Mr. Camacho from committing future offenses.  Five years in prison for a non-violent offense is a harsh penalty, particularly since Mr. Camacho has come so far in the years that have elapsed since the offense.  With a five-year sentence, Mr. Camacho will miss critical milestones in his daughter's life, such as her first step, potty training, and her first days in school – events he dreams of being present for.  *See* Exh. A.  Those dreams are dashed because of his actions, and he know that "I have no one to blame but myself."  Exh. A.  Mr. Camacho has expressed genuine remorse for his conduct:  "There are no words strong enough to express how sorry I am for having put my family and loved ones through so much pain."  *Id*.  He has expressed his remorse not just to the Court, but to his family.  *See* Exhs. B, D-F.  He would cry to his fiancee's brother, telling him how much he regrets his actions.  *See* Exh. D.  He has told his cousin how horrible he feels about what he's done, because "now he sees his actions not only affected him, but his daughter and the rest of his

9

family as well." Exh. E. Given how close the Camacho family is, and how devoted Mr. Camacho is to his infant daughter, five years in prison will have an extremely punitive effect on Mr. Camacho. A longer sentence would be too harsh, as Mr. Camacho's parents, who are not in good health, will be in their 70s when he is released, even with a five-year sentence. He already was separated from his father and brother for two years while this case was pending, and separating him from them, as well as the rest of his family (including his daughter) for more than five years on top of that is not necessary to achieve just punishment.

As for deterrence, a sentence of more than 60 months is not necessary to prevent Mr. Camacho from committing future offenses or to protect the public. Although he has a prior drug trafficking conviction, Mr. Camacho has never been to prison; he served his sentence in county jail pursuant to AB109, and because he served half time for that state conviction, with additional county jail credits, he served only about a year and half. A sentence of five years therefore would be more than three times the only sentence that he previously served. Perhaps more importantly, Mr. Camacho has shown through his conduct over the past two years how much he has changed, and that he is not the same man who committed this offense. He explains, "When I look back at the person who did all these things to cause such tragedy I do not recognize him." Exh. A. In addition to conquering his addiction and throwing himself into job training, the biggest transformation has come from his new role as Grezia's father – a motivating force that Mr. Camacho did not have after his first conviction. Ms. Ceja is confident that he will not commit any more crimes because "he wants to be the best example to our daughter and any future children we have." Exh. B. His cousin similar believes that "this is a huge wake up call for Oscar because he doesn't just have himself to think about, but his daughter Grezia as well." Exh. E.

When he is released, Mr. Camacho will have the support of his parents and his fiancée, who will stand by his side and make sure he continues on the path of rehabilitation to which he has been committed since his arrest in December 2017. He

10

plans to go to school and become a chef, and to hopefully one day start his own restaurant to provide for his family.  *See* Exhs. A, B.  He has shown that he has what it takes to achieve those goals, and that his ready, willing, and able to rejoin his family as the hardworking and responsible son he used to be, and the devoted father he has become.

### D.    The Advisory Guidelines

The defense agrees with the advisory guideline calculation in the PSR, which finds that his conviction on the drug count groups with his conviction on the gun count, resulting in a total offense level of 27.  The government's contention that the counts do not group, and that Mr. Camacho should receive an additional level for having multiple groups of offenses under U.S.S.G. § 3D1.4, is incorrect for several reasons.

### 1.    The counts are properly grouped pursuant to § 3D1.2(c)

The PSR has determined, and the parties agree, that the base offense level for the drug count (Count 2) is 28.  PSR ¶ 39.  The PSR further assigns a two-level enhancement under § 2D1.1(b)(1) for possession of a dangerous weapon – namely, the guns that were the subject of Mr. Camacho's guilty plea to Count 1 (conspiracy to dispose of firearms to a prohibited person).  PSR ¶ 40.[3]  Section 3D1.2(c) provides that two counts group "[w]hen one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts."  U.S.S.G. § 3D1.2(c).  Because Count 1 "embodies conduct [Mr. Camacho's possession of the guns that he conspired to have disposed to him] that is treated as a specific offense characteristic in, or other adjustment to, the guideline

---

[3] The defense does not object to the imposition of this enhancement, as it requires only that the defendant possessed a dangerous weapon and does not require the government to prove a connection between the weapon and the offense.

1   applicable to [the drug count]," the two counts group under the plain language of §

2   3D1.2(c).  *See* PSR ¶ 36.

3        The government contends, however, that despite the plain language of

4   § 3D1.2(c), the counts should not group, resulting in a one-point enhancement under

5   § 3D1.4, yet Mr. Camacho should still receive an enhancement for possession of a

6   dangerous weapon under § 2D1.1(b)(1).  According to the government, "the specific

7   enhancement applied to Count 2 – possession of a dangerous weapon during the

8   commission of a drug offense – is not the same course of conduct to which defendant

9   pled guilty in Count One [the 922 count]."  Gov't. Obj. to PSR, Dkt. #312, at 2.  But

10  3D1.2(c) does not require that the two counts be based on the same "course of

11  conduct."  It requires only that the defendant receive a specific offense characteristic

12  for one count that embodies conduct that is charged in another count – in this case, Mr.

13  Camacho's possession of the guns that he conspired to have disposed of to him, for his

14  possession, in Count 1.[4]

15       In support of its position, the government quotes a portion of Application Note 5

16  to § 3D1.2(c) which states, "It is not… the intent of this rule that (assuming they could

17  be joined together) a bank robbery on one occasion and an assault resulting in bodily

18  injury on another occasion be grouped together."  Dkt. 312. at 3 (quoting U.S.S.G. §

19  3D1.2, application note 5).  The government goes on to say (again quoting a portion of

20  the application note), "This is because the two offenses 'represent a different harm.'"

21  *Id*.  But the government's selective quotation of the application note omits critical

22  language that undermines its position.  This is what the application note actually says:

23       It is not, for example, the intent of this rule that (assuming they could be joined

24       together) a bank robbery on one occasion and an assault resulting in bodily injury

25       on another occasion be grouped together.  *The bodily injury (the harm from the*

---

[4] The guideline states "embodies conduct," with no requirement that the specific offense characteristic embody *all* of the conduct at issue in another count.

*assault) would not be a specific offense characteristic to the robbery* and would

represent a different harm.  On the other hand, use of a firearm in a bank robbery

and unlawful possession of that firearm are sufficiently related to warrant

grouping of counts under this subsection.

U.S.S.G. § 3D1.2, application note 5 (emphasis added). In this case – unlike the first

example in the quoted language above – the government is seeking, and Mr. Camacho

is receiving, a specific offense characteristic for the harm from his possession of

firearms at the time he possessed the cocaine.  The government's omission of the

italicized language above is misleading, and the Court should reject the government

attempt to contort the language of the application note to fit its argument.

Moreover, the government concedes that the counts would group if Mr. Camacho

had been convicted of violating § 922(g), unlawful possession of a firearm by a felon

(as the application note's example of a robbery involving a firearm, and possession of

that firearm, makes clear they would).  *See* Gov't. Obj. at 3.  The government attempts

to distinguish Mr. Camacho's Count 1 conviction for conspiracy to dispose of a firearm

to a prohibited person, in violation of 18 U.S.C. § 371, 922(d), from his unlawful

possession of those firearms.  But this argument directly contradicts the position the

government took earlier in this case, when it told the Court that in order to convict co-

defendant Carlos Fernandez, the seller of the guns, of the same conspiracy, "the term

'dispose of' means to transfer a firearm so that the transferee acquires possession of the

firearm….*The government therefore must prove that Camacho Jr. possessed the guns

that defendant FERNANDEZ sold to him*."  Dkt. #242 (Gov't. Obj. to Fernandez's Mot.

in Lim. to Exclude Evidence) (emphasis added).[5]  Even the government has

acknowledged that the Count I conspiracy embodies the conduct of Mr. Camacho's

---

[5] Fernandez had moved to exclude text messages Mr. Camacho had sent to an unindicted individual, including photographs of the guns he'd purchased from Fernandez, which, as the government argued, showed that Mr. Camacho possessed those firearms.

1    possession of the firearms.  It is that conduct that is the subject of the § 2D1.1(b)(1)

2    enhancement to the Count II offense level, and the counts therefore group under §

3    3D1.2(c).

4        The government wants to have it both ways – it wants Mr. Camacho to receive

5    an enhancement for the firearms on the drug count, and for the counts not to group,

6    resulting in an additional one-point enhancement.  This is exactly what § 3D1.2(c) was

7    designed to prevent.  For all of the above reasons, it is beyond dispute that the conduct

8    for which Mr. Camacho is receiving a two-level specific offense characteristic – his

9    possession of the guns found at his house at the time he possessed the cocaine for sale –

10    is embodied in Count One, conspiracy to dispose of those firearms to him, and

11    therefore the counts properly group.[6]

12        ## 2.    If the counts do not group, there would be no enhancement

13            under § 3D1.4 because the government has incorrectly

14            calculated the offense level under § 2K2.1

15        The government's argument that Mr. Camacho should receive a one-level

16    enhancement under § 3D1.4 rests not only on its claim that the two counts of conviction

17    don't group under §3D1.2, but also on the government's calculation of Mr. Camacho's

18    base offense level under § 2K2.1.  The government contends that Mr. Camacho's base

19    offense level under § 2K2.1 would be 20, given "defendant's prior conviction for a

20    controlled substance offense."  *See* Dkt. #312 at p. 4, n.2.

21

22    _____

23        [6] The government suggests in a footnote that the defense's agreement to an
     appellate waiver at offense level 28 is a concession that the counts do not group (or is

24    otherwise relevant to the Court's analysis).  *See* Gov't. Obj. at p. 4, n.3.  But defense
     counsel informed the government that the defense did not agree with the government's

25    interpretation of § 3D1.2(c), and that the defense intended to argue that the two counts
     group under the guidelines.  The government declined to change the appellate waiver to

26    match the defense's calculation of the offense level, but the defense's decision to accept

27    the plea agreement with the waiver chosen by the government was in no way a
     concession that the government's guideline calculation is correct.

28

                                        14

1    But Mr. Camacho's conviction under California Health and Safety Code § 11378

2    for possession of methamphetamine for sale does not qualify as a "controlled substance

3    offense" under § 2K2.1(a)(4) because California's definition of methamphetamine is

4    facially broader than the federal definition, and thus the statute is categorically

5    overbroad.  Specifically, § 11378 is facially overbroad because California defines

6    methamphetamine to include its "optical and geometrical (diastereomeric) isomers,"

7    while the federal definition of methamphetamine covers only its optical isomers,

8    without criminalizing its geometrical isomers.  *Compare* Cal. Health & Safety Code §

9    11055(d)(2), § 11033 with 21 U.S.C. § 802(14), 812 Schedule II(c); *see also United*

10   *States v. Rodriguez-Gamboa*, 946 F.3d 548, 551-52 (9th Cir. 2019); *Lorenzo v.*

11   *Whitaker*, 752 Fed.Appx. 482, 485 (9th Cir. 2019) ("*Lorenzo II*").[7]

12   In *Rodriguez-Gamboa*, the government made a factual argument that the Ninth

13   Circuit had declined to reach in the *Lorenzo* cases (because the government had made

14   the argument for the first time on appeal) – that California's definition of

15   methamphetamine is not categorically overbroad because as a factual matter, the

16   government claims, geometric isomers don't exist.  The defense argued (as it does here)

17   that the facial overbreadth of the statute ends the analysis, because the Ninth Circuit has

18   held that "when a state statute's greater breadth is evident from its text," a party "may

19   simply rely on the statutory language to establish the statute as overly inclusive."

20   *Chavez-Solis v. Lynch*, 803 F.3d 1004, 1010 (9th Cir. 2015) (citing *United States v.*

21   *Grisel*, 488 F.3d 844, 850 (9th Cir. 2007) (en banc), abrogated on other grounds by

22   *United States v. Stitt*, 139 S. Ct. 399, 407-408 (2018)).  The government in that case

23   contended that because it believes that geometric isomers of methamphetamine do not

24   exist, there is no realistic probability that the state would apply the statute to conduct

---

26   [7] *Lorenzo II* followed the Ninth Circuit's de-publication of its opinion in *Lorenzo*
     *v. Sessions*, 902 F.3d 930 (9th Cir. 2018) ("*Lorenzo I*").  In both opinions, the Ninth

27   Circuit held that § 11378 was facially overbroad because California's definition of

28   methamphetamine includes geometric isomers, while the federal definition does not.

that falls outside the generic definition, relying on *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007). The Court in *Rodriguez-Gamboa* found that the defense's argument has "strong support in our precedents," citing *Grisel*, but because the government's argument rested "entirely on its factual assertion that the geometric isomer of methamphetamine does not exist," and the district court had not made a factual finding on that issue, it remanded the case for an evidentiary hearing to resolve the factual issue.

Here, the government has not made the factual assertion that geometric isomers of methamphetamine do not exist. Indeed, it has not addressed this issue or *Rodriguez-Gamboa* at all, opting instead to simply assert in a footnote that Mr. Camacho has a conviction for a controlled substance offense. But it is the government's burden to prove the enhanced base offense level it is seeking under § 2K2.1. *See United States v. Snipes*, 515 F.3d 947 (9th Cir. 2015); *United State. v. Howard*, 894 F.2d 1085, 1090 (9th Cir. 1990) (government has the burden to prove any fact necessary for determination of the base offense level). The government has not attempted to meet its burden here, nor can it.

The base offense level under § 2K2.1 for Mr. Camacho's conviction on Count II therefore is 14. With a four-level enhancement for the number of firearms, this brings the offense level to 18 (before a reduction for acceptance of responsibility), which is 12 levels lower than the pre-acceptance offense level of 30 for Count I (the drug count). Under § 3D1.4(c), any group of counts that is 9 or more levels less serious than the group with the highest offense level is disregarded; thus there is no enhancement for multiple groups. The result is that even if the two counts did not group, Mr. Camacho's offense level, after a three-level adjustment for acceptance of responsibility, would be 27 – just as the PSR determined.

This results in an advisory guideline range of 78-87 months. That range, of course, is merely advisory, and it is but one of many factors that the Court must

consider in imposing sentence.  As set forth above, the remaining factors weigh in favor of a sentence of 60 months.

## IV.  CONCLUSION

For all of the above reasons, the defense respectfully requests that the Court impose a sentence of 60 months in custody.

Respectfully submitted,

AMY M. KARLIN
Interim Federal Public Defender

DATED:  February 10, 2020          By  */s/ Jill Ginstling*

JILL GINSTLING
Deputy Federal Public Defender

17